Good morning, everyone. Welcome to the Illinois Appellate Court, 1st District, 1st Division. We're going to ask the lawyers who are going to argue on the first case to both step up and tell us who you are and whom you represent. Good morning, Your Honors. Ruth Block on behalf of Appellate Selective Insurance. Good morning, Your Honors. Edward Bishop on behalf of Creation Supply. All right. Thank you, Counsel. Under Illinois Supreme Court Rule 352B, each side has 20 minutes for the main argument. The appellant has 10 minutes for rebuttal. We may change that if we have a lot of questions or if the argument becomes repetitive. We do have two cases on the call today, so we may cut you off a few minutes early. Please remember to speak loudly. Our microphones do not amplify very well. They are here to record what's being said. Also, please understand we have read the briefs. We are familiar with the facts of the case. So devote your time to your strongest arguments. All right. Mr. Block. Good morning, Your Honors. Again, Drew Block representing Selective Insurance. As you know, this is an insurance coverage dispute related to the duty to defend a personal and advertising injury-type offense. A selective issue to policy of insurance containing business owners' coverage, Creation Supply, for an effective policy period of August 19, 2010 to August 19, 2011. As you know, as relevant here, the policy under certain circumstances provides coverage when not otherwise excluded by the policy for certain personal and advertising injury offenses as they're defined. As this Court is aware, the case law is an almost universal agreement that in order for allegations contained in an underlying complaint to fall within the initial grant of coverage provided by the policy, Creation Supply, the insured, has the burden of establishment. Namely, that the insured was engaged in an advertising activity during the effective policy period, that the underlying case alleges an offense within the policy's definition of personal and advertising injury, and three, and here I believe most importantly, there be a causal connection between the damages alleged in the underlying case and the alleged advertising activity. Stated another way, the causal connection requirement means that the insured must establish that there is something about the contents of the advertisements themselves, separate and apart from the allegedly, in this case, infringing product, that directly caused the damages claimed by the plaintiff in the underlying case. As you know, as relevant here, coverage, or the trial court at least arguably found coverage on the basis that certain unpled allegations of trade dress infringement were contained in advertisements. Mr. Black, after the briefing was completed in an issue where we issued an order requiring supplemental briefs on the issue of the brochures distributed at the trade show, because I think it's a fair reading of that order, if you read the tea leaves, that perhaps there was a thought that that was a more compelling coverage issue than the display cases at the art stores, which is really what the briefing focused on. Sure. Is there anything in the record that tells us how many of these brochures were distributed at the conventions or how widely they were distributed, of course using the word of the policy, widely distributed? No, there's not. The record of Mr. Gregg's deposition indicates only that those particular brochures, and that's the one that was attached to his deposition transcript as Exhibit 10, was handed out to various sales representatives engaged by Creation Supply to potentially, frankly it's not 100% clear, maybe hand out to potential customers in the sales representative's efforts to actually make sales. As we indicate, that leads to the conclusion in my mind that that was sort of personal solicitation, not widespread distribution. And there's no evidence that that brochure was published to the general public at large, to any particular group. But can we make a distinction with respect to the term advertising that differentiates between retail and wholesale customers? I mean, if you're at a convention and OfficeMax is there, all right, and you're handing out the brochures to OfficeMax, isn't that just as much advertisement as if you're advertising in Time Magazine to the general public? Yeah, I mean, I actually do agree that being at a trade show and handing out brochures at that trade show would most likely be considered an advertising activity. However, that again sort of begs the question back as about when this occurred, which goes into a prior publication argument as the trade shows referenced in Mr. Gregg's deposition occurred prior to the inception of the policy period, July 2010, for one example. So, you know, I, you know, as I argued in the supplemental briefing, you know, the evidence with regard to, you know, that brochure to the extent that that may have been sort of advertised at a trade show prior to the inception of the policy and maybe handed out on a one-to-one basis by sales representatives potentially after the inception of the policy would essentially go into the prior publication exclusion. Rather than the fact that there is an advertisement creates coverage. And, you know, with regard to this brochure, too, even beyond the fact that it does not appear that creation supply has met its burden of establishing that that brochure was published, i.e., widespread distribution to the public at large or to a specific market segment and was rather handed out on a person-to-person basis. Is that brochure part of the record? Is it in the record? It is. Yes. It was attached as Exhibit 10 to Mr. Gregg, who was the President of Creation Supplies Deposition, and referenced in the request for supplemental briefing. Also, just sort of in general about this brochure as well, again, even to the extent that it could be established that this was widely distributed after the policy period and not before or vice versa, there is still a causal connection requirement problem here, too. That being that the source of the injury as alleged in this underlying complaint and throughout and as admitted by Creation Supply over and over and over again in the briefs is that the underlying plaintiffs were complaining about the shape of the markers that infringed upon their shape of the markers. In this brochure, which, while containing promotional material, doesn't say anything offending about the shape of the markers. If you look at the brochure, it says, use our Creation Supply markers because the ink is great, because you can shade with it. It's good for art projects. It doesn't say something like this shape of the marker, you know, is a great shape of the marker. It's similar to Coppock markers. But isn't that what trade dress is all about? I mean, we don't go to McDonald's because we want the food to be served under golden arches, but that's, you know, the distinctive architecture of McDonald's is considered its trade dress, right? I agree. And the same thing is in this case. We've got these markers with the square tops, and it distinguishes them from other markers. Correct. The shape of the markers or depictions of the shape of the markers themselves is the gravamen of the underlying trade dress. All right. Now, on that issue, we've got the other side's brief here, and they have the color picture of the display in the art store. And it's a little hard to see, but if you put on your reading glasses like I have to, I mean, you do have a header over each group of markers, which has a gigantic, you know, probably 20 times life-size depiction of one of the markers next to the word, I think it's Blick, right? Right. Or Mexi, Mexi. Yeah. Mexi brush marker, and there's this gigantic brush marker showing its distinctive shape.  Well, I mean, I don't necessarily, I mean, I argue in the underlying case that that trade, that display, is not advertising separate and apart from the shape of the markers. The trade, I mean, what it is here is just the trade dress. In order to be covered under the policy and going into the causal connection requirement generally in the case law, there has to be something about the contents of the advertisement separate and apart from, in my view, a depiction of the marker itself or the marker itself that's actually causing the injury. There's nothing in that in-store display separate and apart from this, the shape of the marker that is causing. Black, you answered my question before I asked it. I was going to ask you to develop your argument regarding the content of the advertising versus, you know, just the actual advertising itself. Right. And I think, you know, it's difficult. The case law is a little bit fuzzy on causal connection. You know, all the courts agree that the causal connection requirement is a requirement. But particularly with regard to the trade dress issue, which, you know, isn't brought up a whole lot, you sort of need to look at the cases, I think, that find a causal connection requirement to see why it's not met here. As the case law suggests, and this is McDonald's and Capital Indemnity of Elston and Advance and all the cases that we cite over and over again, coverage should only exist when the injuries claimed in the underlying case are not exacerbated or revealed by subsequent advertising depicting the trade dress. But instead should only be coverage should only be available when the injury is actually caused by something about the advertising. The easiest way to look at this is, you know, for example, in the Capital Indemnity v. Elston case. In that case, they found a causal connection requirement because Elston was actually putting pictures of Newport cigarettes in flyers and then sending counterfeit and then actually selling counterfeit cigarettes. So the injury was actually caused by them, by Elston, actually appropriating Newport cigarettes' goodwill in order to sell a counterfeit product. The Flodine cases are also instructive. In that case, they found the causal connection requirement because the actual advertisements, separate and apart from the products being advertised, were advertised as Indian-made products when they, in fact, weren't. So again, in Flodine, it wasn't the product itself that met the causal connection requirement. It was the fact that the advertising misled the public. Here, with regard to, for example, the in-store display, for example, this brochure, what's offending to the underlying plaintiffs is the trade dress of the product itself. It's just the shape of the marker. And that's what shows up over and over and over again, is here's the shape of the marker. I mean, as Creation Supply stated over and over again in its briefing in the underlying case, two marker and imagination weren't complaining, weren't claiming damages because of the advertising. They were complaining of damages because the product looked the same. And that doesn't meet the causal connection requirement here. If the product itself, or depictions of the product itself even, met the causal connection requirement inherently, then the policy wouldn't be written to only provide coverage arising from trade dress infringement, for example, in your advertisement. Advertisement being in quotes, it's separately defined in the policy. So it can't, you know, here in this case, you know, the damages occurred when Creation Supply infringed, allegedly, upon the shape of the marker. The fact that, and this is like advanced watch, the fact that they later put a picture of the product that is the source of the infringement claim in, you know, an advertisement without anything about the advertisement causing some direct independent damage just doesn't meet the causal connection requirement as necessary under the policy. This is a duty to defend case, correct? Correct. Okay. Now, if this is such a close call, how do you handle all of these cases that say there doesn't have to be, a possibility is enough, it doesn't even have to be probable, just so there's enough there liberally interpreted to show that it's inclusive? Well, I mean, I think that... You'll agree with me that's the status of the case law. Oh, correct. Yeah, I mean, it just has to be potentially covered by the allegations. I mean, I think that the allegations, when you... And now we're debating was it an advertisement, was it not an advertisement, was there a causal connection, was there not a causal connection? And they're all close issues. Right. As briefed out by the parties. Right. So with the liberal interpretation of the law in determining whether or not there's a duty to defend, why aren't we not bound to go along with the circuit court here? Well, the answer to that question, I think, is that the causal connection requirement is a threshold issue in order to get an initial grant of coverage. Separate and apart... Isn't that usually a jury question, though? Causal connection? I don't think it necessarily needs to be. True. Right. I mean, the causal connection... That's generally the trier effect. Sure. But, I mean, here, the causal connection requirement, in order to get into the initial grant of coverage, is something that can be found in the complaint in the underlying case. The complaint in the underlying case, in my view, isn't even really close on this issue. They don't allege that anything contained in any advertisements caused that injury. The underlying case, read as a whole and specifically, while vaguely mentioning advertising, hammers home over and over and over again. And as Creation Supply states, the cause of the damage was the shape of the infringing product. This isn't like other cases that found a causal connection, as I indicated. This isn't... There's nothing alleged in the underlying case that says, hey, you know, you put out a brochure or put on your website that, you know, you were selling... You told people you were selling Copic markers, but you were really selling Mepsi markers. Or you were saying that Mepsi markers were just like Copic markers. Nothing like that is in the underlying complaint. The initial grant of coverage, under the causal connection requirement, just simply is not met here because of the allegation that the damages were solely caused by infringement of the shape of this writing instrument. Mr. Baca, I'm going to ask you to close up your remarks, but let me ask you a question before you do so. Sure. Remind us, please, what's the status of the case in Oregon, the underlying case? Somewhat a complicated issue. My understanding, as of right now, it's totally done. I can tell you, with regard to allegations asserted against Creation Supply... All right. So let's assume, for the sake of discussion, it's over and you had some result. Correct. Did the company defend under a reservation of rights or simply not defend at all? We did not defend and filed a complaint for declaratory judgment shortly after the test. So it was defended at the insurer's own expense? Correct. With their own counsel? Correct. Okay. I think I've really said most of what I need to say on causal connection. If some greater prior publication argument needs to be made on a response... All right. Any other questions? No. All right. Thank you. Mr. Bishop. Thank you. May it please the Court. Edward Bishop here for Creation Supply. We request that this Court affirm the Circuit Court's grant of summary judgment for Creation Supply and deny Selective's motion for summary judgment. What we're talking about here is a duty to defend. And you're exactly right with regard to duty to defend. It only potentially has to be covered by the policy. What do we do here? What we do is we look at the complaint and we compare what's in the complaint to the policy. It's simply stated out that way. With regard to the complaint that was filed in Oregon in the District Court, what do we find here? We find four counts. Three of those counts are clearly with regard to trade dress infringement. Three of them. The first count talks about a registered trade dress. The second count talks about another registered trade dress. The third count talks about unregistered trade dress. The fourth count talks about common law rights in trade dress. The next thing we do is we simply look at the policy. The policy talks about advertising injury. One of the things that's different from this one than most of the cases that are cited is this policy specifically includes trade dress. It talks about trade dress. It says that's advertising injury. It's included in your advertisements. It even puts in its exclusion that it does not apply to trade dress. Mr. Bishop, what about your opponent's point that your main theory in the underlying cause of action was the shape of the marker? They spend a lot of time talking about that. What's your response to that? With regard to trade dress, what trade dress infringement is, and this is set out in our brief and this is also set out by the Patent and Trademark Office and their rules, trade dress is the configuration of the marker, the shape of the marker, and how it looks. That's what trade dress infringement is, and that is specifically what they're complaining about in their complaint. They say the configuration of the marker. There's a squarish end cap that they're not happy about, and they're not happy about the squarish design of the overall shape of the marker. That's what they're complaining about, the configuration. They even refer to the trade dress statute, and they specifically set out Landomax Section 43A in Count 3. So they're complaining about the trade dress, but how are they complaining about the trade dress with regard to this? They're complaining specifically about our advertisements. They specifically set out in their complaint that you are advertising these markers, and this advertisement that you're doing with regard to the shape of the markers is causing confusion. That's the definition of infringement. Your advertisements regarding your trade dress are causing confusion. It's very simple with regard to this case. It's just an understanding of what trade dress law is and what they're complaining about. Now, the circuit court took it a step further. The circuit court, instead of just looking at the allegations in the complaint, looked to the extrinsic evidence. They said, you know what, they're complaining about your advertisements, but what are some of your advertisements? So we took it a step further. Here's one of our advertisements in a store that they complained about in Oregon. What do we see in the store? We see the trade dress prominently displayed in a placard above a rack. We see the boxes. Just the picture is enough. Just the picture with regard to your product. That's enough to be an ad. You're prominently displaying it. You're trouting what it looks like. You're saying this looks better than the other markers. That's trouting the configuration of your marker. You're showing it off. Big, prominent display, as the judge said, right above it. Not only that, what is the configuration of the boxes? If you look at the boxes at the Dick Flick store in Oregon, you can see right through them. Why can you see right through them? So you can see the trade dress, which is what they're complaining about. I'm not following what you mean by you can see through the display boxes. Are you saying that you can see through to the next aisle of the store? No, when you actually look, the markers are stored in a plastic box. When you look at the colored picture, there are actually some of them below. There's the actual rack of markers. And then below that, when you look at the picture, you can actually see that the markers are stored in see-through plastic boxes. So you can actually see what the markers look like, the trade dress. So the markers aren't loose like this pencil? They're both. They're both, okay. When you look at the actual display, above it, there's racks of the same color markers. So if you want to just grab one marker, you can pull that marker out. Oh, but you could buy several markers in a set. That's what I'm looking for. And it's in a see-through box. So once again, we're trouting. Now, where else are we trouting? And what are they complaining about in the complaint? They're mad about our advertisements on the website, website advertisements with regard to our trade dress. It's in the complaint again. So when you look at the complaint and you see that, once again, they're complaining about the trade dress and what you're doing on your website, which is clearly an advertisement. In fact, their own definitions state advertisement on the website. So, Mr. Bishop, your opponent talked about the advertising or non-advertising at the trade show. You've talked about one in a store. Then there was one on the website. What else? Give me the list of all the places that, in your opinion, they constituted advertising. I would say that there was the website, there was the in-store advertisement. I would say also that there might have been others. There was the brochure that was distributed. But once again, when you look at all this in-stripes of evidence what we did wrong, you look at the complaint first. Is there a probability of coverage with regard to the complaint? So there are multiple places. We don't know what else they were complaining about. We never got a chance to ask to mark or to underline complaint. What else are you complaining about other than those advertisements that we found when we went beyond the complaint that we're supposed to fix? What about his argument that it's the content of the advertising that's really important? The content of the advertising, once again, the content of this advertisement that they're complaining about is our trade dress. It's the depiction of the marker. It's trouting the aspects or how it looks, the configuration. And we're trouting the configuration of there's no doubt about that because when you go to the rack and you look at the rack, what do you see? You see the ends of those markers. And that's one of the things that they don't like is because the marker configuration, actually the color code steps out a little bit. It stepped out from the rest of the marker. And they're square. And we show those off prominently in the placard above it. But when you look at the actual underlying complaint, once again with regard to the advertising, you can see with regard to in the underlying complaint, paragraph 16, they talk about defendant Croatian Supply sells the Mepsi markers to retailers through the United States including Oregon. They also say Croatian Supply sells the Mepsi markers directly through its websites. So they're complaining about advertisements. Now when you go on later on, they say defendants without permission or approval advertised and sold products using a squarish marker body configuration and squarish marker end cap configuration in the United States. Once again, they're complaining about our advertising. Then they say in 43 of the underlying complaint, defendants offered their respective products and services to customers. More telling is paragraph 47, where they complain about not only the retail stores in Oregon, they also talk about the websites and other online retailers. But the worst one is paragraph 45 of the underlying complaint, where they say defendants unauthorized use of squarish marker cap configuration in connection with marker products is not authorized and is likely to cause confusion and mistake to deceive customers at the source of the origin. They are complaining about, once again, our advertisement and how we depict or trout the trade trust. Mr. Bishop, let me ask you the same question I asked the opposing counsel. What's the status of the case in Oregon? The case is closed. Was it tried? Was it resolved through a motion or settled or what happened? There was a settlement that was reached at the end of the case at the end of the day. And my understanding is the markers are no longer distributed in the United States. Okay. Your markers are theirs. Well, they're alpha markers that made it. We were distributing the markers, our markers. The alpha markers are no longer distributed in the United States. The copic markers still are because they had to change this. And that's what they're complaining about. So turning to the case law and the causal connection, because there is the argument with regard to is there a causal connection, when we look at the policies that are at issue in those cases, when we look at what is actually in the underlying complaint, there is a fuzzy area there. With regard to, for example, the McDonald's case. In the McDonald's case, it was trade secret theft that was complained about. Yeah, there's a question with regard to advertisements. Here did not trout the trade secret theft. It wasn't anything about the trade secrets or the internal operation. Advanced watch, which they rely on heavily, there was nothing in the policy with regard to trade dress. But what was being asserted was trade dress. Well, in this case, it's different. They're complaining about trade dress, and the policy specifically spells out trade dress. Now, there's also the other issues with regard to did Mr. Gregg know anything about their trade dress rights, and especially their unregistered trade dress. There's no proof of that. With regard to the issue of what he displayed at shows there's no record with regard to he had the trade dress in his possession before the policy inception. One of the problems with regard to these markers, the alpha markers, is they came from Korea. He did not have the markers or know what the configuration was, and the record is pretty clear on that. He wasn't exactly certain. And that's why he had mock-ups of the markers, because he was guessing what they would look like. But that's not trade dress infringement guessing. It has to be the actual markers. Mr. Bishop, when we get a case on our desks, one of the first things we often do is go to the back of the white brief first and read what the judge below did. Why don't you tell us why you think, sort of comment on what the judge below said. The judge below, when he looked at it first, he was looking to see what our advertisements were. He was more interested in regard to what did you advertise. He was looking at those. We initially brought it from, okay, it's the complaint by itself. But when he saw the advertising, he wanted to know what those advertisements were, especially when we brought it up with regard to the extrinsic evidence. Once again, I think we went too deep with regard to looking at the extrinsic evidence. It's, once again, one of those things, is there potential for coverage based on the language that's in the policy and based on the complaint allegations. So the judge looked at it. He did find once he looked at it that, yeah, you're advertising. It's an advertisement. Is it fair to say the judge was relying on the placards in the display rack or was it a focus on what really triggered the coverage in his mind? I think it was both because the judge referred to not only the placards, but he continued to refer to, he remembered that just putting the item in a display and how it is actually shown or what they call dressed in the display also goes to that element. Yeah, but see, that's sort of where I'm headed here. This is a difficulty I have with that. You know, every product is displayed. So under your argument, couldn't you say, like, just the mere fact that you show them to a customer triggers coverage? That that somehow becomes trade dress? It might. This was actually a printed publication, or at least the placard was. But the problem here is... Let's leave the placard aside. Let's only talk about the fact that they're all lined up in a display case for a customer to grab off the shelf and buy. It may actually be in this case because the policy in this case, which is different, covered trade dress. So if it didn't cover trade dress, then we would have to go to that causation element. But under that analysis, isn't everything... I mean, I can go to Dunkin' Donuts across the street and they've got the chocolate donuts all lined up in a row on a tray. How is that different than your markers lined up in a tray in an art store? The difference is they're complaining about our specific design of our markers. The difference with Dunkin' Donuts, you don't have a trade dress registration on the donut. So you're complaining about our specific characteristics of our design and how it actually looks when the markers, the ends, and how they flare out. That's what they're complaining about. That specific trade dress. Donuts, no. It's not going to fall under the policy. There's no trade dress in a bunch of donuts in the store. But there is with regard to our specific marker. And that's what the advertisements were about. And I have nothing further. Thank you. Thank you. A brief rebuttal. Mr. Black. Thank you again, Your Honors. I think counsel's first mistake, I suppose, is that his continued reiteration of his argument that the policy covers trade dress. The policy doesn't cover trade dress. The policy covers trade dress in an advertisement. This causal connection argument is built right into the language of the policy, separate and apart from the fact that. What? I didn't understand what you just said. The policy doesn't say that we provide coverage for trade dress infringement. The policy says we provide coverage for trade dress infringement in an advertisement. That's the causal connection requirement. That's why this exists. Can you explain in very simple terms what the difference is for me? You know, being that we all agree that the duty to defend is pretty broad, I'd like you to define for me what is the difference that's significant here in your mind. What's significant is the case law pretty much all suggests that, and it's quoted in the Elston case citing this global computing case, and it's again referenced in the Greenwich case, that the mere advertising of an infringing product doesn't give rise to advertising liability under a policy. There's a difference between whether two marker sued them for trade dress infringement and whether it's actually covered. And when courts find coverage, it's when underlying cases allege injury arising, directly arising out of something about the advertisement. The trade dress itself, the product itself, as I think the court recognizes, isn't the advertisement. All right. Let's go down that line. Okay. Why doesn't the placard showing the gigantic 20 times life size marker with squarish caps, that's not only placed once but maybe four or six times on the display, why doesn't that trigger coverage? Because that is, once again, the offending part of that advertisement, if it so is, is again just the trade dress of the product. There's nothing about that. There's nothing about that placard that's offending two marker. What purpose does the placard serve other than to advertise the product to passers-by in the aisle of the art store? I agree, but again, that's a different prong of the three-part test. You have to have advertising. I mean, I think it's pretty clear, at least with regard to the website issue, that there was an advertising activity. Was there trade dress in an advertisement? I don't know. You still have to meet the cause of connection requirement, and there's nothing, the only offensive thing in that placard is, once again, the shape of the marker, and that doesn't meet the cause of connection requirement. Going back to an earlier question that Justice Harris asked, considering that the argument, it's all so close and the arguments are so esoteric and we all agree that the duty to defend is very broad, why should, you're basically asking us to reverse the trial court. Under the scenario that I just gave, why should we do that? I mean, we have to write something. When we write, if we do what you're asking us, we have to write something. What's the justification for that, given the broadness of the duty to defend and the closeness of these arguments with respect to whether there's coverage or not? Help us out here. I think the compelling reason to overturn the trial court and issue an opinion, frankly, is that there's not really good case law in Illinois recognizing the fact that these CGL-type policies, with regards to these kind of advertising injury offenses, are supposed to be not covering just allegations of infringement generally. They're advertising injuries. They're publication injuries. And what we have here is a trade dress complaint that, when the trade dress was incidentally contained in subsequent advertisements that did not in and of themselves hurt the underlying plaintiff. This really isn't what these policies are supposed to cover. These policies are supposed to cover damages caused to them by the advertising, not the infringement. And that's really the compelling reason to overturn the trial court. Let's say, and of course I'll always say it hypothetically, you lose this case and the other side wins. The case in Oregon is over. It was settled. So on a practical standpoint, this is all about a chunk of money representing the legal fees used to defend the Oregon case. We now have a quantified dollar figure, right? I would hope so. But the judge in the trial court actually has not issued a money judgment. And there's various other... You mean the Judge Flynn? Judge Flynn has not. Well, I don't know. Sure. But I can tell you that... He's up here, not down there. Right. I can tell you that there is not a quantified, unfortunately, a quantified number. But there will be. I mean, somebody knows it someplace. I would hope. And Mr. Bishop's nodding. Yeah. Right. Has anybody tried to settle this case? Absolutely. We mediate it. All right. Okay. Thank you. Thank you. Thank you. Any more? All right. The case will be taken under advisement. And we'll ask you to change for the other case. And the clerk will call the roll.